## HARTMAN TRUST IN RE

Ohio Appeals, 2nd Dist, Franklin Co

No 2860. Decided March 21, 1939

Henry Gumble, Columbus, John A. Conner, Columbus, for beneficiaries under the trust.

Hedges, Hoover & Tingley, Columbus, attorneys for The Ohio National Bank of Columbus, Ohio, successor trustee.

James I. Boulger, Columbus, for Mary B. Davis, executrix of Earl S. Davis, deceased.

Wilson & Rector, Columbus, for The United States Fidelity & Guaranty Co.

**OPINION**

By BARNES, J.

The above entitled cause is now be-ing determined as an error proceeding by reason of notices of appeal on questions of law from the judgment of the Court of Common Pleas of Franklin County, Ohio.

The cause originated in the Probate Court by reason of exceptions filed to the 12th and final account of Mary B. Davis, as executrix of Earl S. Davis, trustee under the last will and testament of Samuel B. Hartman, deceased.

Notices of appeal on questions of law were filed by the United States Fidelity and Guaranty Company by reason of its surety liability, having duly executed a bond in the sum of $300,000.00 for Earl S. Davis, trustee as aforesaid.

Joint notices of appeal on questions of law were duly filed by The Ohio National Bank of Columbus, Ohio, as successor trustee, and also by Maribel Hartman Finnel, Kathaleen Hughston Cunningham and Virginia Hartman Hughston, as sole beneficiaries under the trust.

Dr. Samuel B. Hartman, for many years a resident of Columbus, Ohio, died testate in January, 1918, leaving an estate of more than a million dollars, which consisted of a farm south of Columbus, comprising nearly 4000 acres, numerous costly city properties, extensive live stock holdings and a large block of securities, among which was the entire stock of the Peruna Company, a corporation with headquarters in Columbus, Ohio; also the entire stock in The Ohio and Southern Interurban Terminal and Depot Company, then running south of Columbus as far as the Catholic cemetery.

On February 4, 1918, the will was filed and probated in the Probate Court of Franklin County, Ohio.

The first item of the will appoints Earl S. Davis, of Columbus, Ohio, executor and trustee. Davis qualified as executor of the estate and within one year after his appointment he filed his final account as such, and on January 11, 1919, he was appointed trustee thereunder, and on the same day he qualified as such by executing and filing in the Probate Court of Franklin County a bond for $300,000.00, with the United States Fidelity and Guaranty Company

as surety. Mr. Davis continued to act as trustee under the last will, testament and codicils of the said Samuel B. Hartman, deceased, until his death on or about March 1, 1930.

The trustee filed in Probate Court 11 accounts, as follows:

1st Account, filed January 30, 1920; approved April 30, 1920;

2nd Account, filed February 8, 1921; approved April 22, 1921;

3rd Account, filed January 24, 1922; approved March 2, 1922;

4th Account, filed January 27, 1923; approved March 3, 1923;

5th Account, filed January 26, 1924; approved April 7, 1924;

6th Account, filed January 21, 1925; approved March 28, 1925;

7th Account, filed January 29, 1926; approved April 20, 1926;

8th Account, filed February 9, 1927; approved May 2, 1927;

9th Account, filed February 6, 1928; approved April 4, 1928;

10th Account, filed February 14, 1929; approved March 16, 1929:

11th Account, filed February 21, 1930; approved April 2, 1930.

The 12th and last account was filed by the executrix of the trustee, on March 5, 1931; and within thirty days thereafter exceptions were filed thereto by the beneficiaries and the successor trustee, and on motion all of the former accounts were opened up by the court.

During the course of the hearing it developed that the trustee was paid one-half of the commissions received by real estate brokers growing out of the purchase by the trustee of certain pieces of real property for the estate with funds of the trust. Thereupon leave was requested of the court by all of the exceptors to amend their exceptions to recover such commissions, which request was granted.

In the Probate Court, where this cause originated, the three beneficiaries under the trust in March, 1931, filed exceptions, setting out eight particulars in which the various accounts were not true and correct.

At the start of the trial these exceptions were, by leave of court, amended and thereunder were added three other particulars, designated A, B and C, in which the accounts were not correct. All of the exceptions filed by these three beneficiaries are claimed to relate to income, which, under the provisions of the will, was in part to be distributed to these three beneficiaries, and in which question these three legatees are directly interested.

The successor trustee, The Ohio National Bank, in their exceptions to the twelve accounts in substance raise the identical questions as presented in the exceptions of the beneficiaries, and, in addition, other exceptions which relate to the corpus of the trust estate.

The hearing in the Probate Court started before Judge Bostwick, but before the determination of the question Judge Bostwick had retired from office and was succeeded by Judge McClelland.

By agreement of counsel, or at least without objection, Judge McClelland took up the cause where Judge Bostwick left off and continued the hearing to a final determination.

Each and all of the exceptions made by the three beneficiaries of the trust were sustained, and in addition one of the separate exceptions of the successor trustee relative to a real estate transaction was sustained.

By proper procedure the case was carried to the Court of Common Pleas, where the cause was heard de novo.

By agreement of counsel, the cause was heard in the Common Pleas Court upon the transcript of the evidence taken before the Probate Court. In the final judgment the Common Pleas Court sustained the same exceptions as had the Probate Court, except in two particulars, and, as was done in the Probate Court, overruled all others. The two points of difference between the two courts will be referred to later when these specific exceptions are discussed. It must be understood that the cause comes to us not as a de novo hearing, but one for review of the judgment of the Court of Common Pleas.

The usual rule obtains that the judgment of the Court of Common Pleas

must be sustained unless it affirmatively appears that prejudicial error intervenes.

Upon all factual questions the same rule applies as in a trial to a jury. This means that we may not reverse simply because we might have determined differently had we been trying the cause as an original action, but must yield to the judgment of the Court of Common Pleas on all questions of fact unless it appears that such determination of fact is against the manifest weight of the evidence.

Four separate interests, through their attorneys, have filed in our court voluminous briefs. Rarely, indeed, have we been favored with such careful and exhaustive efforts. These briefs contain the last word as the several questions are discussed pro and con.

An independent research avails us nothing. On many questions each brief is convincing until you read one contra to the theory advanced, where again we are confronted with a persuasive anaylsis. We are also favored with very able and comprehensive written opinions by both the Probate Court and the Common Pleas Court.

It is now something like eight years since this cause started in the Probate Court.

In familiarizing ourselves with the history of this case from the time of its inception down to the present day, we find very little, if any, deviation from the charted course maintained by counsel representing the respective parties. In other words, the position taken by attorneys for the respective parties in the trial before the Probate Court was the same as is now being urged in this court.

What we consider the able opinions of the Probate Court and the Court of Common Pleas have not been convincing to counsel on any question decided adversely.

We do not hope to meet with any greater favor. We recognize that a determination by our court is a condition precedent to having the cause determined in the Supreme Court of Ohio, and possibly thereafter in the Supreme Court of the United States. From the above remarks we do not want it understood that we are in any sense peeved should the cause go to the higher courts. Considering the amount involved, we expect nothing else. However, the above situations may be explanatory as to why we have concluded not to fully discuss and analyze all the cited cases or the controverted questions of fact. In the main we shall be content to give our conclusions, now and then citing cases upon which our conclusions are based.

The first proposition with which we are confronted is the question first raised in the Probate Court as to its jurisdiction to hear exceptions to the trustee's accounts, from 1 to 11, inclusive, all filed and approved prior to the 12th account filed by the executrix of Earl S. Davis, trustee. The Probate Court determined that it had jurisdiction to open up and consider exceptions to all prior accounts. This determination by the Probate Court was similarly determined by the Common Pleas Court when the cause was heard before it de novo. This question is determined by a construction of §11033 GC, which reads as follows:

"11033. **Force and effect of the determination.**—The determination of the Probate Court on such settlement, shall have the same force and effect as a like determination respecting the account of an administrator or executor. When an account is settled in the absence of a person adversely interested, and without actual notice to him, the account may be opened on his filing exceptions to it within eight months thereafter. Upon any settlement of an account by a trustee, all his former accounts may be so far opened as to correct a mistake or error therein, except that a matter of dispute between two parties, which had been previously determined by the court, shall not be again brought in question by either of the same parties without leave of the court."

Concretely, it is urged by counsel for the Davis estate and 'The United States Fidelity and Guaranty Company, that this section specifically limits the opening up of former accounts to "correct a mistake or error;" and further that the exceptions not be..ng based upon mistake or error, but upon charges of fraud, which raises a chancery question, can only be tried in a court having chancery jurisdiction.

Counsel for the exceptors take the position that this being a remedial section, it must be given a liberal construction and that the words "error or mistake" would include errors or mistakes of law or fact, and all cases where the fiduciary had made improper charges as credits himself or had omitted to charge himself with assets coming into his hands.

We agree with counsel raising the question of jurisdiction that liberality of construction may never extend to questions of jurisdiction. Jurisdiction is conferred by law, and in determining jurisdiction the rule of strict construction must be followed. Much can be and has been said by both sides on this question as it pertains to the intant case. The reasoning of counsel for the exceptors, with the cases cited, together with the analysis of the lower courts appears to us to be the rule applicable in the case at bar.

In the first place, the several items under consideration were unknown to the beneficiaries under the trust, and do not appear in any way in any of the previous accounts. Hence, it could not be said that any of the present questions had been previously determined by the court.

We cannot think that where an item of charge is omitted from a fiduciary's account, that the jurisdiction of the Probate Court to open up would be controlled by the mental attitude of such fiduciary. In other words, if an item was omitted by accident, the rule of error or mistake would be invoked; whereas, if he intentionally omitted it and appropriated it to his own use, the jurisdiction of the Probate Court would be denied because through fraudulent conduct an equitable question would be raised and could only be heard in a court having chancery jurisdiction.

We hold to the doctrine that when a trustee omits from his account proper items to be charged against himself, the Probate Court has jurisdiction to open up, unless the question has been raised and determined at a former hearing, or the beneficiaries are barred by reason of acquiescence or laches.

In order to understand the powers and duties of the trustee, we now quote from certain pertinent provisions of the will of Dr. Hartman:

"ITEM FIFTH. All of my real estate, wherever the same is or may be situated, I give and devise to my said executor and trustee, and all of my personal property except that mentioned in Item Fourth of this Will, of whatever kind and description and wherever the same is or may be situated, I give and bequeath to my said executor and trustee, to have and to hold in trust for the uses and purposes following, to-wit:

1. To retain the possession, care and control of said real estate, to maintain the same in a suitable condition to rent to the best advantage, to lease the same for such periods and on such terms as he deems best, to keep the buildings thereon fully insured and to maintain the same in good repair, to erect buildings thereon and to remodel and improve any of the buildings thereon whenever and in such manner as he may deem necessary, and to pay out of the gross income derived from said real estate all lawful taxes and assessments thereon and the costs of said improvements, repairs and insurance; and I hereby empower my executor and trustee to sell and convey any part or all of said real estate, on such terms as he may deem best, and to invest the proceeds thereof in improved real estate or, at his option, in income producing securities; and I further empower him from time to time, at his option, to sell any or all of the securities in which he shall have made investments, as aforesaid, and to invest,

and, from time to time, reinvest the proceeds of such sales in improved real estate, or, at his option, in other income producing securities.

"2. To retain the possession, care and control of said personal property until, in his judgment, the same or any part of it should be sold for the best interests of my estate and to collect the income therefrom; and I hereby empower my said executor and trustee, at his option to carry on any business in which I may be engaged at the time of my death so long as he deems it to be for the best interest of my estate, and to use in said business any or all of the personal property belonging to my estate which in his judgment may be suitable for that purpose; and I hereby further empower him to sell any of said chattel property which, in his judgment, should be sold and to invest the proceeds thereof in improved real estate or, at his option, in income producing securities; and I hereby empower and direct my executor and trustee, through his control of the capital stock of The Peruna Company, a corporation organized under the laws of the State of Ohio and having its principal office in the City of Columbus, Ohio, to carry on the business of said corporation so long as in his judgment said business can be carried on to the advantage and benefit of my estate, but I hereby empower him, through his control of the capital stock of said Company, to sell all of the property and assets of every kind of said Company as a going concern whenever in his judgment that course would be for the best interest of my estate, or, at his option, to sell all of the capital stock of said company which may be a part of my estate, whenever in his judgment that course would be for the best interest of my estate, and on such terms as he may deem advisable, and I hereby empower and direct him to sell any other securities which may be a part of my estate at the time of my death whenever in his judgment such sale would be to the advantage of my estate, and upon such terms as he may deem advisable; and I hereby empower him to sell any securities of any kind which may be a

part of my estate at any time whenever in his judgment it would be for the best advantage of my estate to sell them, and on such terms as he may deem advisable, and in case of such sale or sales, I hereby direct and empower him to invest and to re-invest from time to time the proceeds of any securities which he may sell in improved real estate, or, at his option, in such income paying securities as he may deem advisable.

"ITEM SEVENTH: I hereby empower and direct my executor and trustee to vote all shares of the capital stock of all corporations of which I shall be the owner at the time of my death and all shares of the capital stock of which my estate shall be the owner during the continuance of the trusts mentioned in and created by the Fifth Item of this Will, and to exercise that power at all of the meetings of the stockholders of said corporations, or of either of them, whether general or special, and on behalf of my estate to exercise any and all lawful powers with reference to all of said capital stock which will not be inconsistent with the powers conferred upon my executor and trustee in and by said Item Fifth.

"ITEM EIGHTH: At the close of every successive period of six months after my death I hereby direct my executor and trustee to make or cause to be made a written statement showing his receipts and disbursements during said period and the condition of my estate at the conclusion of the period covered by said statement, and to permit the same to be examined at all reasonable times by the devisees and legatees mentioned in this will, or, at his option, to furnish them full and true copies thereof."

The will was executed on April 3, 1912.

The compensation to be paid the trustee is provided in Item Third of the First Codicil, which we quote in full:

"ITEM THIRD. It is my wish, and I hereby direct that my said executor and trustee, Earl S. Davis, mentioned in

Item First of my saia Last Will and Testament, shall receive and be paid as compensation for his services as such executor and trustee not less than the sum of Ten Thousand Dollars ($10,000.00) per annum, and that if the net income of my estate, payable to the child or children and to the grandchild or grandchildren of my said daughter, Maribel Schumacher, or to either of them, as provided for and defined in my said Last Will and Testament, after the payment to him of said compensation of Ten Thousand Dollars ($10,000.00) per annum, shall exceed the sum of One Hundred Thousand Dollars ($100,000.00) per annum in any one year while said Earl S. Davis shall perform the duties of executor and trustee of my estate, he shall receive and be paid as his compensation for said services during said year such sum, not exceeding the aggregate amount of Twenty Thousand Dollars ($20,000.00), as will not reduce such net income below the aggregate amount of One Hundred Thousand Dollars ($100,-000.00), it being my intention that he shall not receive and be' paid as his said compensation for any one year while he performs his duties as my said executor and trustee less than the sum of Ten Thousand Dollars ($10,000.00) per annum nor more 'than the sum of Twenty Thousand Dollars ($20,000.00) per annum, and that the amount of the compensation to be received by and paid to him shall depend upon the amount of said net revenue as aforesaid, the minimum in any one year not to be less than Ten Thousand Dollars ($10,000.00) and the maximum in any one year not to exceed Twenty Thousand Dollars ($20,000.00); that his said compensation shall be payable to him in equal monthly installments at the end of each month; and that my said executor and trustee shall devote all of his time to his duties as such executor and trustee."

The Codicil was executed on January 16, 1913.

At this time we will also quote from the Will relative to the beneficiaries under the trust:

"ITEM FIFTH.

"3. If my said wife should survive me, I give and bequeath, and direct my executor and trustee to pay, to her during her natural life one-half of the net income derived from my estate, real, personal and of every kind whatsoever, said payments to be made semi-annually, and not to be diminished by all or any of the following provisions of this will; the provisions made for my said wife in and by this Item and in the last preceding Item of this will are intended to be in lieu of her dower and all other statutory rights and interests which she may have in and to my estate.

"4. If at the time of my death there should remain unpaid all or any part of a certain indebtedness now amounting in the aggregate to the sum of Two Hundred Thousand ($200,000.00) Dollars, which is secured by mortgage on real estate situated at the southwest corner of State and Third Streets in the City of Columbus, Ohio, now owned by my daughter, Maribel Schumacher, and known as the Hartman Building, I empower and direct my executor and trustee, so long as said indebtedness or any part of it be unpaid, to retain out of that part of the net income of my estate, which has not been hereinbefore given and bequeathed to my said wife, such a sum annually, as an Income Producing Sinking Fund, as will be sufficient to pay all of said indebtedness then unpaid and the interest accruing thereon, and, from time to time and so far as necessary, to use said sinking fund for the purpose of paying said principal and interest, it being my intention that my said daughter, to whom I have heretofore given said real estate, shall not be compelled to pay said indebtedness or any part thereof, but that the same shall be paid by my estate; but I direct that no part of the net income of my estate mentioned in the last preceding paragraph of this Will shall be used for the purpose of creating said sinking fund or for the purpose of paying said indebtedness or any part thereof; but if my said wife shall not survive me then and in that event the moneys necessary for the creation of

said sinking fund shall be retained out of the entire income of my estate and used to pay and discharge said mortgage indebtedness in the manner aforesaid.

"5. If my daughter. Maribel Schumacher, shall survive me, and if during any calendar year after my death and during her natural life and while she owns the real estate mentioned in the last preceding paragraph hereof and maintains on and as a part of said property the present building thereon or a building or buildings of at least equal value, the amount of the net income derived by her from said real estate shall be less than the distributive share of the income from my estate given and bequeathed to each of my said grandchildren as hereinafter provided, then and in that event I hereby empower and direct my executor and trustee to pay to my said daughter out of said net income hereinafter given and bequeathed to my grandchildren such sum as, when added to the amount of the net income which my said daughter shall receive from said real estate during said calendar year, will equal the amount of the income from my estate which each or any of my said grandchildren shall be entitled to receive from my estate for said calendar year under the provisions of said bequests hereinafter made to them.

"12. Subject to the foregoing bequests, I give and bequeath all of the net income of my estate to the child or children of my daughter, Maribel Schumacher, and to the issue of the deceased child or children of my said daughter, who shall survive me, if any there be, and direct my executor and trustee to pay the same to them, or to the survivor or survivors of them, share and share alike, per stirpes and not per capita, during their natural lives; but if the distributive share of the income of my estate so given and bequeathed to any of my said grandchildren or great grandchildren during his or her minority shall exceed the sum of Five Thousand ($5,000.00) Dollars per annum, I hereby empower and direct my executor and trustee during such minority not to pay such excess to my said grandchild or great-grandchild, but empower and direct him to withhold, retain and invest such excess until such grandchild or great-grandchild shall have attained the age of majority, at which time I empower and direct my executor and trustee to pay to such grandchild or great-grandchild the aggregate amount of such excess which shall have been withheld by my executor and trustee as aforesaid and all income received thereon; and, by the words, "net income," used in this paragraph I mean what shall remain of the gross income of my estate after the payment of taxes and assessments on my real estate, taxes on my personal property, the cost of insurance, the cost of maintaining my real estate in suitable condition and repair, the cost of erecting, remodeling and improving buildings on said real estate, the cost of administering my estate, the bequests hereinbefore made, and my just debts."

Dr. Hartman prior to his death was the sole owner of all the capital stock of The Peruna Company, being 1000 shares of $100.00 each. He caused to be issued four or five shares to employes, but these shares were never delivered and in each instance were endorsed in blank by the individual to whom they were issued. The sole purpose of the issuing of these single shares to other persons was to make up a Board of Directors. They constituted what are commonly termed "dummy directors". None ever received any dividends. Dividends when issued were paid on the entire 1,000 shares to Dr. Hartman. The subsequently named trustee, Earl S. Davis, prior to the death of Dr. Hartman was an employee, holding the position of Treasurer and General Manager. Some five years prior to the death of Dr. Hartman he had entered into a contract with Mr. Davis for and on behalf of the Peruna Company, by which Mr. Davis was to receive a compensation of $10,000 a year for his services to the Peruna Company. A further contract, executed on the same date, provided that Mr. Davis was to perform services for Dr. Hartman looking after his other interests, for which

he was to receive no additional compensation, but contained the provision that if for any reason the Peruna Company should fail to pay the salary of $10,000.00, that Dr. Hartman would pay it personally. The contract was for a period of five years, with provision that either party might cancel it at the expiration of any year. Otherwise it might continue beyond the five years, if not cancelled.

There was no direct notice of cancellation by either party, but following the death of Dr. Hartman and the qualifications of Mr. Davis as executor, there was no further operation under the contract. For a few years prior to Dr. Hartman's death the yearly compensation under the contract was paid as follows: $6000.00 by the Peruna Company and $4000.00 by Dr. Hartman.

In February following Dr. Hartman's death, Mr. Davis returned $500.00, being salary for month following testator's death.

The 995 shares of Peruna Company stock in the name of Samuel B. Hartman was not transferred on the books of the company until December 28, 1925, at which time Earl S. Davis caused the same to be issued to himself.

Following Mr. Davis' appointment as executor, the first organization of the Board of Directors provided that Earl S. Davis should be president and treasurer, and John N. Spetnagle, general manager, assistant treasurer and purchasing agent. Maribel H. Schumacher was named as a member of the board, but never qualified or attended any directors' meetings. Earl S. Davis and J. N. Spetnagle and Maribel H. Schumacher were named members of the executive committee. Mrs. Schumacher never qualified or attended any meetings of the executive committee.

At one of the meetings after the organization of the new board by Davis, there was voted to him a salary of $10,000.00 a year from the Peruna Company, and also a bonus which was paid to him on February 4, 1919, of $16,-684.53, and a second bonus, paid to him on January 27, 1920, of $10,386.85. The salary and bonuses received by Davis during 1919 and 1920 totalled in excess

of $52,500.00. During this same period of time the salary of John N. Spetnagle was materially increased and bonuses were also allowed and paid of more than $18,000.00.

Following the allowance and payment of the bonuses made to Davis and Spetnagle, they each made a refund which was placed in the hands of Davis and kept by him as a special account, no part of which was distributed to the beneficiaries or accounted for in the estate. Its existence was only ascertained after the death of Mr. Davis on March 1, 1930, and the subsequent appointment of his wife as executrix, when she found the papers and some securities relative to this special account in a safety deposit box and turned them over to The Ohio National Bank, the successor trustee. The Ohio National Bank received them conditionally as a depositary and not as belonging to the trust, pending the final determination of the exceptions then filed in the Probate Court.

The next question presented through the exceptions and considered and determined by the trial court, relates to salaries and bonuses paid to Earl S. Davis by the Peruna Company. The exceptions refer to each item separately and the trial court makes his findings as to each item separately, which was necessary and proper in order to determine the date from which interest would be calculated. We find no controversy as to the amounts or the dates, and hence we will not discuss the items separately but will determine the controlling principle which will affect each and all items.

Counsel for the exceptors urge that Earl S. Davis, trustee, had no authority or right to draw salaries or bonuses from the Peruna Company; further, that any amount paid to him came into his hands as trustee.

Counsel for the estate of Mr. Davis, as well as the bonding company, take the position that The Peruna Company being a corporation was a separate entity and was controlled entirely through its Board of Directors, and not by the will of Dr. Hartman, save and except that the stock owned by Dr. Hartman

passed to Mr. Davis, as trustee, with powers to vote the stock and receive dividends thereon when declared; that The Peruna Company being controlled by a Board of Directors, the voting of salaries and bonuses to Mr. Davis, trustee, and Mr. Spetnagle was a matter entirely within their discretion unless impeached for fraud, and even then the action should be by the corporation to recover any funds misappropriated, or if the corporation refused to bring such action, then the stockholders could bring it in a court of equity; that the salaries and bonuses allowed and paid became the sole property of the recipients thereof and could not be classified as income or part of the corpus of the trust that the profits of the corporation were not distributable to the beneficiaries until the Board of Directors declared dividends to be paid out of such funds.

Counsel for the respective parties devote many pages of their briefs to the question of separate entity and its effect.

Counsel for exceptors urge that by reason of the fact that the estate of Dr. Hartman, represented by Davis, trustee, owned and controlled all of the stock of the corporation, that courts should look through the corporate fiction in order to do exact justice. Further, that Dr. Hartman, through the first codicil of his will, Item 3 above quoted, having provided that Mr. Davis, his trustee, should devote all his time to the affairs of the estate and be paid therefor a compensation of $10,000.00 per annum, or not exceeding $20,000.00 a year under certain conditions, (which conditions never arose) that this allowance included his services to the Peruna Corporation and that he had no right to vote himself a salary and bonus to be paid from the Peruna Corporation. The Probate Court in its determination of this question, as appears from the opinion, followed the theory of counsel for exceptors.

The Common Pleas Court announces the same principle as did the Probate Court, and in addition declared the principle that any and all moneys received by Mr. Davis were received by him as trustee, and hence he should be held accountable for all salaries and bonuses received by him. We think the last theory of the Common Pleas Court may be elaborated upon. In so doing we have constantly before us the provisions of Dr. Hartman's will as to the salary to be paid the trustee and that he should devote all his time in the interest of the trust; also that all stock of the Peruna Company passed from Dr. Hartman to Davis, trustee. Also the specific provision of Dr. Hartman's will wherein he states:

"I hereby empower and direct my executor and trustee through his control of the capital stock of The Peruna Company, a corporation organized under the laws of the State of Ohio, and having its principal office in the City of Columbus, Ohio, to carry on the business of said corporation so long as in his judgment said business should be carried on to the advantage and benefit of my estate."

The powers granted under the will of Dr. Hartman to his trustee were very broad. It might properly be said that these powers were almost equal to what Dr. Hartman might have done had he been living, except the salary of Davis, trustee, was fixed and the distribution or income was provided for. In no place in the will was it expressly provided that Mr. Davis, trustee, should have himself elected on the Board of Directors or president and treasurer, or to any other office. Since the Peruna Corporation was by far the largest income producing interest of Dr. Hartman, it was highly proper that Mr. Davis, trustee, should be a member of the Board of Directors and in very close touch with the management of its business. This would be one of the implied powers under the will of Dr. Hartman; but, as we see it, any and all official connections of Mr. Davis through the estate's control of the stock of the corporation was not as an individual but as trustee. In other words, he was a trustee-director, a trustee-president and treasurer. The law casts upon a corporation the

obligation of conducting its business through a Board of Directors. For obvious reasons a president, secretary and treasurer are needed, and hence the law provides for their election or selection. This was the same formality which was gone through-with during the life time of Dr. Hartman. Mr. Davis, as a member of the Board of Directors and as president and treasurer, stood in the place of Dr. Hartman, and all his activities relative to The Peruna Company were as trustee. Being required under the law to give all his time to the affairs of the estate, for which a salary had been fixed, he could not take on individual employment; neither could he use the stock in his hands as trustee to elect himself as an individual to the Boar dof Directors of The Peruna Company and to the position of president and treasurer as an individual, but only as trustee. As to whether or not Dr. Hartman in his life time drew a salary from The Peruna Company is not disclosed, but under the conditions then existing there would be no reason so to do except for accounting purposes, since he and he alone, received all profits from such business. Had the Income Tax Law been in operation during the life of Dr. Hartman, it is highly probable that he would have voted himself a salary and also a bonus, so as to reduce the income upon which income taxes were to be calculated. So long as his salary and bonuses were within reason, no objections would have been made by the taxing authorities. Large industries very generally have, through the advice of expert accountants and income tax advisers, on their books set up many additional charges and provisions through which the net income subject to income tax has been materially reduced. Prior to the passage of the Income Tax Law these matters were not considered of importance, although authorized and proper. Such action must be within the bounds of reason, and when supported by sound business methods the administrators of the Income Tax Law have made no objections.

We see no reason why Mr. Davis, as trustee, could not cause to be done the same things that could have been done by Dr. Hartman had he been living. Considering the volume of business and profits, we are inclined to think that had Dr. Hartman been living and had drawn a salary of $10,000.00 and 10% of the net profits as a bonus, no one would have considered it excessive. At this late day I think we are warranted in saying that the administrators of the Income Tax Law have raised no objections as to the amount.

Under the powers granted in the will we think that Mr. Davis, trustee, had the power through the Board of Directors to vote salaries and bonuses.

At this point we come to the parting of the ways. Whatever Mr. Davis received as salary and bonus, he received as trustee, and not individually.

The books of the company presented in evidence disclose that for two or three years immediately following Mr. Davis' appointment as executor and trustee, the profits far exceeded those of previous years. It is urged by counsel representing Mr. Davis and the Bonding Company that it was through his efforts that the profits were increased and for that reason, along with others, he should be allowed to participate for the excellent showing he made. On the other side, it is urged that the Prohibition Law had more to do than any other one thing in the increased profits, due to the fact that Peruna contained a large alcoholic content and was being used by many people throughout the United States as a beverage rather than as a proprietary medicine, as originally intended. In support of this last theory, it is pointed out that when the Federal Government took action against the sale of Peruna, its business was materially affected, resulting in the sale of the entire business in 1926.

Conceding the claim of counsel for Mr. Davis and the Bonding Company that the increased volume of business and profits was due to his management, we are compelled to say that under the situation then existing Mr. Davis would not be entitled in law to retain the

salaries and bonuses which we determine came into his hands as trustee.

The trustee, having converted these amounts to his own use and not at any time accounting therefor to the trust, the finding of the Common Pleas Court sustaining the exceptions will be affirmed in the amounts found by the Court, together with interest from the dates named.

This brings us to the question as to the complaint of the exceptors as to increased salary and bonuses paid to John N. Spetnagle. During the time that Mr. Davis, trustee, was receiving bonuses, the salary of Mr. Spetnagle was materially increased, and he likewise was given a bonus. These bonuses covered a period of about two years. The bonuses paid Mr. Spetnagle were slightly less than those paid Mr. Davis. Prior to Dr. Hartman's death, Mr. Spetnagle, according to the minutes of the Peruna Company, was elected a director in January 1918, just before Dr. Hartman died, but according to Mr. Spetnagle he had no connection with the company until after Dr. Hartman's death. As soon as Davis, trustee, set up his new organization, Spetnagle was placed in a position of responsibility, namely that of Manager, Assistant Treasurer and Manager of Purchases. The allowance of the advanced salary and bonuses appears from the minutes of the Board of Directors of The Peruna Company. It is probably true, in view of what will be said later, that the adoption of the new Federal Income Tax law was largely responsible for the voting of the bonuses, and possibly the increased salary of Mr. Spetnagle. The positions of Davis and Spetnagle are different in that the latter in no sense was acting as a fiduciary. The proceeding under which he received his increased salary and bonus was regular, in that it was directed to be paid by action of the Board of Directors. No orders or findings are asked against Spetnagle. The exceptors request that this excess salary and bonus be charged against Davis, on the ground of fraud in promulgating its allowance and payment. We refer back to what was said relative to the bonuses paid to Davis, trustee, and in particular to that portion wherein we said it was not necessarily fradulent conduct on the part of Davis in having salary and bonus voted to himself, as trustee, but that the error arose when he appropriated the amounts to himself individually and failed to account to his trust.

So far as Spetnagle is concerned, he was under no obligation to account when the amounts voted to him in the way of excess salary and bonus belonged to him, unless susceptible to attack through fraud. The Probate Court in his finding sustained the exceptions and charged the amount against Davis. The Common Pleas Court overruled the exceptions. We are inclined to follow the ruling of the Common Pleas Court; therefore the judgment of the latter on this exception will be sustained.

We will not take up what has been designated a special account, the data for which was found in a safety deposit box of Mr. Davis by his executrix after his death. We have heretofore referred to the contents of this safety deposit box having been delivered by the executrix to the successor trustee, The Ohio National Bank, and held by it as a depositary until such time as the Court determined the exceptions then pending in the Probate Court.

From the evidence of Spetnagle and documents found in the deposit box, it very clearly appears that the amounts supposed to be in this special account were by reason of refunds made by Davis and Spetnagle from their respective bonuses. The amount was ascertained by setting up the total net profits of The Peruna Company and calculating the income tax thereon if no bonus had been paid, and thereafter in an opposite column deducting the total bonuses for the year from the net profits and calculating the income tax on the net balance this obtained. From such figures it was ascertained that the net balance remaining after deducting the bonuses and the income tax under a lower bracket would not leave for distribution to the beneficiaries under the trust as large an amount as though the taxes had been paid on the larger

amount in the higher brackets, with no deductions for bonuses. This difference was made up by contributions to this special fund, with the result that the beneficiaries would then receive slightly more than they would had the taxes been charged and collected under the higher bracket. Whether or not any of this special account or the income therefrom ever reached the trust account, is not shown in the Bill of Exceptions. Practically all of the securities are in the name of Earl S. Davis individually, and not as trustee. A mortgage and note are included in the list, but it seems that the name of the grantee is a fictitious person and that in reality the grantee was Earl S. Davis, the mortgagor grantor being a relative of Davis. Under this situation Davis is accountable for any and all ▮▮▮▮▮▮ amounts received from Spetnagle to be placed in this special account. So far as the Davis estate is concerned, it has already been charged with the total amount received as salary and bonuses, and hence there should not be a second charge made against it. However, the securities in the safety deposit box should be investments made from the rebated bonuses, but there is a divergence in amount and the securities are in Davis' name. There may be a commingling of funds. The Ohio National Bank successor trustee, should not be obligated to accept these securities as a part of the corpus of the estate, nor should the beneficiaries be required to accept them as distribution on income. ▮▮▮▮▮▮ We have arrived at the same conclusion as did the Court of Common Pleas, and likewise hold that the trust estate would have a lien on the contents of this box and that the same be sold and applied to the trust obligations of the estate of Earl S. Davis.

Since reading our text relative to the special account, we have taken it upon ourselves to make an independent search for the purpose of ascertaining whether or not the income or principal referred to in this special account ever came into the trust.

We find nothing in the briefs of counsel suggesting that any of the fund was accounted for, nor is any reference made thereto in the bill of exceptions. We have gone to the accounts excepted to and there find that Davis, trustee, apparently did charge himself with income on the mortgage heretofore referred to as made to a fictitious grantee.

This mortgage is frequently referred to in the records and briefs as the Beebe note and mortgage. We find in the 6th Account, filed January 21, 1925, this note listed as receivable for $6500.00, but shows no interest collected thereon. The 6th Account also discloses large dealings in Government bonds, but we are unable to identify any of these as those bonds mentioned in the special account.

In the 7th Account, filed January 29, 1926, the trustee accounts for interest on the Beebe mortgage, at 7%, for $455.00. This account also shows some Federal Bank transactions, but they can not be identified with the bonds held in the special account.

In the detailed inventory for December 21, 1934, attached to this account the Beebe note is listed for $6500.00. The 7th Account shows over $60,000.00 invested in United States and Land Bank bonds, but there is no way of identifying any as including any part of the Government bonds mentioned in the special account.

The 8th Account, filed February 9, 1927, disclosed a charge for interest on the Beebe note for $227.50 for six months and also enumerates income from Federal Land Bank and Federal Farm Loan bonds. The sale of more than $57,000.00 of such bonds and Federal certificates is accounted for, but we can not identify any of them as part of the special account. This account, under receivables, lists the Beebe note at $6500.00.

The 9th Account filed February 26, 1928, accounts for the receipt of $682.50 as 18 months' interest on the Beebe $6500.00 note.

Neither the 10th or the 11th Account makes any mention of the Beebe interest, nor do they list the note as receivable.

The 12th and Final Account makes

no mention of the Beebe note, except as it is listed as one of the securities conditionally received .y The Ohio National Bank as successor trustee.

It would thus appear that credits should be allowed for these interest payments as of the date appearing in the account. The charge in the special account will thus be reduced.

If counsel in their further investigation think the court is in error as to these credits, or if opposite counsel is able to demonstrate that not only the mortgage note, interest and income from other securities are accounted for in the trust, we would invite further consideration of these accounts through application for rehearing. Of course, since this is an appeal on questions of law, we cannot accept anything outside the present record. However, we consider the accounts properly before us.

Another item which should have been taken up earlier in this opinion relates to a salary or bonus which was paid to Mr. Davis by a traction railroad solely owned by Dr. Hartman in his life time. This project was incorporated, Dr. Hartman owning all the stock just the same as in The Peruna Company. The observation heretofore made relative to the salary and bonuses paid to Davis by The Peruna Company will apply to this question. The Common Pleas Court sustained the exceptions and we concur in that judgment.

The next question to be taken up and considered is the question of split commissions in the real estate purchases made by Mr. Davis, trustee. In each of the instances the commissions were paid to the real estate brokers by the respective sellers of the properties. The properties were separate and distinct and the sales were made at different dates. In each of the three instances the real estate brokers paid to Davis one-third of their commissions. By reason of the large sale price, the commissions were large and Mr. Davis' split in the three cases totalled $4638.22 or more. Davis considered these splits his own individual property and made no accounting to the estate therefor. This

conduct was reprehensible, and should be strongly condemned. although it may be questioned if Mr. Davis felt that he was doing anything wrong, since he was receiving the commissions from the brokers and took nothing from his trust.

The reason for the rule is founded on sound reason, as follows: that any fiduciary must never place himself in a position where, consciously or unconsciously, he might be influenced in making a deal where the prospect of a substantial sum for himself personally might influence his judgment. The lower courts both held that Davis was accountable for the commissions. We concur in their findings.

Counsel for the Davis estate and the Bonding Company raise the question that the exceptors should be denied any relief by reason of acquiescence and laches. This proposition is intended to apply separately to each exception.

We have read the entire bill of exceptions as originally taken in the Probate Court and by agreement, in transcript form, accepted as the testimony in the Common Pleas Court. We have no difficulty in determining that the claim of acquiescence and laches has no support in the evidence. The reasoning of the lower courts is well grounded, and we accept their language as our own.

Other exceptions not allowed and brought to this court through notice of appeal by the exceptors relate to the the three purchases of real estate heretofore referred to and the effect on the corpus of the trust.

In two instances the real estate purchased was a 99 year lease, which afterwards proved to be a bad investment. Counsel for the exceptors contend that it was such wrongful conduct as to constitute bad faith; and further, that under the provisions of the will of Dr. Hartman the trustee had no power to purchase a 99 year lease. Contra to this position, counsel for the Davis estate and the Bonding Company contend that bad faith is not shown; and fur-

ther that under the provisions of the will Mr. Davis was authorized to purchase a 99 year lease, nd further that if later the investment proved unprofitable was due to the depression which affected all business of every kind and character.

The provisions of the will relative to investments by the trustee, as they appear in different paragraphs, in each and every instance use the following language:

"To invest * * * in real estate or, at his option, in income producing securities."

It is argued pro and con as to whether or not a 99 year lease can properly be described as real estate.

We agree with the determination of the lower courts on this question and are of the opinion that the case of **Ralston Steel Car Company v Ralston, 112 Oh St 306,** is determinative.

In a second real estate deal the evidence disclosed that is was not an outright sale, but rather an exchange of properties. It is urged that the will did not give to the trustee the power to make trades or exchanges of real estate. In other words, that he was limited to making sales or purchases. We think that such construction of the will would be very technical, and not within the spirit of the broad powers given to the trustee by Dr. Hartman under his will.

We concur with the opinion of both lower courts in overruling exceptions.

Another real estate deal involves the purchase of a business property located at 214-216 North High Street. The purchase price was $205,000.00. The claim is made and sustained by the evidence, that at a previous date the purchase could have been made for $165,000.00 The interim between the two times was very short. The evidence discloses that at the time the offer was made of $165,-000.00, the property was encumbered by four separate leases, expiring at different times and producing an income which would pay 6% plus on the in-

vestment. That the owner of the fee was a man by the name or Ruggles, and that the leases were held by the Hirsch Realty Company. The realtors seeking to negotiate the deal were Robbins & Zinn, a reputable real estate firm of Columbus, Ohio. The realtors in their efforts to make the sale, promulgated a plan through which the Hirsch Realty Company in consideration of $40,-000.00 to be paid by Ruggles, agreed to cancel the old leases and execute a single new lease wherein certain options and conditions were eliminated, the expiration period extended and an additional rental of $5000.00 per annum to be paid. This proposition at the sale price of $205,000.00 would net the purchaser an income of 8%. It further appears that the $40,000.00 was stipulated as a loan to be paid back by the Hirsch Realty Company as additional rentals of $5000.00 per year. It also appears that when the deal was closed, Davis, as trustee, paid $95,000.00 cash and assumed mortgages in the sum of $110,000.00. It is inferable that Ruggles when the sale was completed, took the $40,000.00 which he received from Davis and turned it to the Hirsch Realty Company. The question is in dispute as to whether or not Davis knew of the arrangement which was made between Ruggles and the Hirsch Realty Company.

Counsel for the exceptors contend that the deal on Davis' part was no more than a loan, creating the situation whereby he could add $5,000.00 a year to the income. The Probate Court accepted this theory and determined the action to be fraudulent and actuated by Davis for the purpose of increasing the income so that he might receive a compensation of $20,000.00 a year, which was provided in the will of Dr. Hartman in the event he brought the net income of the trust to exceed $100,000.00 per year. The evidence is uncontroverted that Davis never received or was entitled to any compensation other than the $10,000 per year. There is testimony that the Hirsch Realty Company at the time of the deal was considered a very substantial and reputable company. However, after a

few years the Hirsch Realty Company defaulted and went into bankruptcy. The briefs of counsel on this question are very thorough and complete, and we have examined the authorities cited. In some vital questions there is involved a factual determination. The Court of Common Pleas decided against the exceptors and our review being limited to his findings and judgment, we are unable to determine that such judgment was contrary to the manifest weight of the evidence. Therefore, the judgment of the Court of Common Pleas will be affirmed on this question.

There is also involved in this same transaction and included in the exceptions the question of income tax paid by the receiver on the $5,000.00 additional rent paid by the Hirsch Realty Company. Our conclusion on the prior question determines this.

Exceptions F, H and I refer to The Peruna Company's operations in Mexico through various plans of operation.

During the life time of Dr. Hartman The Peruna Company had connections in Mexico, through which its product was distributed. Either before or shortly after his death, The Peruna Company's representatives in Mexico were officered by a man of German nationality and during the World War were not in good standing with the Mexican Government.

For this reason, or others, the sales of Peruna products in Mexico were on the decline. Mr. Davis, trustee, acting for The Peruna Company, felt that it was necessary to change their distributive connections and another concern was procured, but this also proved unsatisfactory. Finally, The Peruna Company of Ohio, acting through Mr. Davis, trustee, organized their own company and a Mr. O'Connell of Mexico was given a prominent and managing position with the new Mexican Company. Mr. O'Connell was presumably a man of influence and in the good graces of the Mexican Government.

Notwithstanding Mr. O'Connell's influence, the Mexican Government finally placed a ban on the sale of Peruna, just as had been done in the United States, and naturally this brought about disastrous results. The trial court held that under and by virtue of the will of Dr. Hartman, Davis, trustee, had the power to use such methods as to him seemed best to promote the sales of the Peruna product. Under these powers he likewise had the legal authority to organize The Peruna Company in Mexico. The trial court finds no fraudulent conduct, and while the venture was a losing one, it was largely due to conditions over which Mr. Davis had no control. We are unable to find that the Common Pleas Court committed prejudicial error in overruling these exceptions.

Exceptions I and H seek to hold the trustee for insurance premiums totalling $2997 paid by the Peruna Company for insurance policies in its favor upon the life of O'Connell, the managing officer of the Mexican subsidiary.

We agree with the trial court in its holding that the Peruna Company had an insurable interest in the life of O'Connell and that relative to this item the exceptions should be overruled.

Therefore, the judgment of the Court of Common Pleas on this item is sustained.

We now think that we have covered every question raised by the several appeals of the conflicting interests.

We recognize that we have not in this opinion taken up paragraph by paragraph the arguments presented by counsel through their briefs, nor the many citations of authorities. We do say, however, that we have read every word of each and every brief filed in the case and have examined and studied all authorities cited. This was rather a laborious task, since the briefs contain within their covers over 400 pages of printed or typewritten matter.

We stated at the outset that it would not be our purpose to quote at length from the evidence or the briefs of counsel, but rather to content ourselves with giving our conclusions.

We find no prejudicial error in the judgment of the trial court, except as to additional credits as pointed out in

the opinion under Special Account, and with this reformation the judgment will be affirmed.

The cause will be remanded to the Court of Common Pleas, with instructions to certify its judgment to the Probate Court unless that action has already been taken. Otherwise, the cause is remanded for further proceedings according to law.

HORNBECK, PJ, concurs; GEIGER, J. concurs in part and dissents in part.

## DISSENTING OPINION

By GEIGER, J.

I am in full accord with my associates in most of the many conclusions at which they have arrived, there being but one major point of difference between us. This relates to the question as to whether or not the salary drawn by Mr. Davis as president of the Peruna Company became a part of the trust estate to be accounted for by him, and upon his failure to do so, to be paid by his bondsmen, he having died insolvent. My associates have so clearly and correctly stated the facts I refrain from discussing them to any extent. The majority arrives at the conclusion that any and all official connection of Mr. Davis through the estate's control of the stock of the corporation was not as an individual, but as trustee; that he was the trustee-director, a trustee-president and treasurer; that Mr. Davis as a member of the Board of Directors and as president and treasurer stood in the place of Dr. Hartman and all his activities relative to the Peruna Company were as trustee, and being required under the will to give all his time to the affairs of the estate for which a salary had been fixed, he could not take on individual employment.

The majority sees no reason why Mr. Davis as trustee could not cause to be done the same things as could have been done by Dr. Hartman had he been living; that had Dr. Hartman received the salary and bonus as president of the company no one would have considered it excessive. The majority then state, "At this point we come to the parting of the ways. Whatever Mr. Davis received as salary and bonus he received as trustee and not individually."

"The trustee having converted these amounts to his own use and not at any time accounted therefor to the trust, the finding of the Common Pleas Court sustaining the exceptions will be affirmed." The majority then finds that the salary and bonus paid to Spetnagle were not a part of the trust estate and should not be accounted for as such.

The majority arrived at this conclusion largely from the provision of Dr. Hartman's will, and in consideration of other matters incident to Davis' administration of the trust and to his activities as president of the Peruna Company.

Dr. Hartman appointed Earl S. Davis "my executor and trustee to administer my estate and to execute the trust mentioned and created by this will." Item VII provides in substance, "I hereby empower and direct my executor and trustee to vote all shares of the capital stock of all corporations of which I shall be owner at the time of my death and all shares of the capital stock of which my estate shall be owner during the continuance of the trust and to exercise all powers at all the meetings of the stockholders and on behalf of my estate to exercise any and all lawful powers with reference to all said capital stock which will not be inconsistent with the powers conferred upon my executor and trustee by Item V."

The 3rd item of the codicil dated January 16, 1913, provides, "It is my wish and I hereby direct that my said executor and trustee, Earl S. Davis, shall receive and be paid as compensation for his services as such **executor and trustee** not less than $10,000 per annum" and in certain events, $20,-000.00, "it being my intention that he shall not receive and be paid as his compensation for any one year while he performs his duty as my said **executor and trustee** less than the sum of $10,000.00 nor more than the sum of $20,000.00 per annum." The amount of

compensation to be received by and paid to him shall depend upon the amount of said net revenue.

"And that my said executor and trustee shall devote all of his time to his duties as such executor and trustee."

The trustee under the will had power to carry on any business that the testator was engaged in; was empowered and directed through his control of the stock of the Peruna Company to carry on the business of that corporation and through his control of the capital stock was directed to sell all the property and assets of the company as a going concern and to vote all the stock of all corporations of which the testator might be owner and to exercise all lawful powers with reference to said stock not inconsistent with the powers conferred upon him."

Provisions as to his compensation were set out in the codicil as above indicated.

Manifestly the will was concerned with the testator's estate and the powers were limited to the action of Davis as executor and trustee. There is no implication that as to the compensation that the provisions of the will should extend to his activities and compensation while acting as president of the company. It specifically covers activities other than those of president, which are not mentioned in the will.

There is internal evidence in the will that the testator recognized the distinction between the corporate entity of the Peruna Company and his estate, seemingly a recognition by him that the final power to carry out his "wishes" with the corporation.

There are external evidences of importance in determining the testator's conception of the scope of the will. The codicil by which Davis' compensation was fixed was dated January 16, 1913. Two weeks before that date the Peruna Company entered into a contract with Davis, executed by Hartman as president, whereby Davis became treasurer and general manager of the company for a period of five years. By this contract he was to devote all his time necessary to the business and was to receive an annual salary ultimately $10,000.00 a year so long as he remained in the services of the company. This corporate contract was signed by Dr. Hartman, a few days before executing the codicil. If Dr. Hartman intended by the codicil to confine Davis' compensation to the amount provided by it, it would have been natural for him to have stated that the compensation provided therein was to be in lieu of the corporate contract, or that on the $10,000.00 compensation of the trustee there should be credited the compensation provided in the corporate contract. The codicil provided that Davis should devote all his time to the trust. The corporate contract provided that he should devote all his time necessary to the business. If he was under contract with the corporation to devote all his time necessary to the business manifestly it would not have been the intent of the testator that he should devote all his time to his duties as such executor and trustee. The codicil did not provide that when compensation as trustee began, that the corporate salary should cease.

If the testamentary requirement was that he actually devote all his time to his trust and in spite of that provision he devoted a portion of his time to his duties as president of the Peruna Company, the beneficiaries under the will were continuously informed of this fact, and also of the fact that he was receiving a salary therefor. If they had objections they should have been made known to the proper authorities. I am of the opinion that it requires a very strained construction of the will and codicil to arrive at the conclusion that Davis was bound hand and foot to the trust and through his holding as trustee of the stock of the corporation was likewise bound to do any service that the corporation might require for the same compensation that was provided by the will for services as trustee. The testamentary compensation was not large considering the extent of the estate, and if in addition to his activities as trustee he performed services for the corporation, as president, the conclusion that he was to do both services for a single compensation seems to

me unjustified by the provisions of the will or codicil. Had Davis refused to act in an official capacity in the corporation some other individual would have had to perform this service for a compensation.

**The right of the corporation to enter into a contract with Davis and fix his compensation.**

The corporation was separate from the trust estate, the only connection being that Hartman during his lifetime and Davis after his death held all the stock. The law endows a corporation with legal existence capable of contracting in the same manner as an individual, and it is an entity existing separate and apart from the natural persons composing it. Its property is distinct from the individual property of its shareholders and changes in shareholders do not affect its liability or its existence, and contracts made by it do not bind its stockholders. The fact that a corporattion takes over a business of an individual who owns all the stock is not sufficient for disregarding the corporate entity. The individual is one entity and the corporation, another. Although one may own all the stock, any loss incurred or profits made are those of the corporation, and this is so even though all the stock is held by one shareholder. The shareholder has no legal title to the corporate property or to the profits until the division is made. Under these principles we must regard the Peruna Company as a separate entity transacting its business through its properly constituted officers. It was formed many years before the death of Dr. Hartman for the purpose of handling a prosperous business through a corporation, separate from his private interests which were many and valuable and flowed largely from the success of the business conducted by the corporation. Engaged as it was in a business that was constantly fluctuating it was desirable that the risk of its corporate business should not involve the separate estate of Dr. Hartman. Upon his death the principle of stock ownership did not terminate and could not be terminated by the provision of the will. That which passed to the executor and trustee were stock certificates, evidencing ownership in an entirely distinct entity. If the view of the majority is correct that what Davis did he did as a trust executor, then it should follow that he should have accounted for all the transactions of the corporation in his reports made to the Probate Court, and the trust estate under such condition, would possibly be responsible for the acts of Davis, acting as a corporate officer. All that the trustee was obliged to account for were all dividends that were paid to him as trustee on the corporate stock. Until so received it was corporate property and not trust property.

I am of the opinion that there was ample authority in the corporation to employ at a salary that its Board of Directors might see fit to pay, and a bonus compensation, those that were qualified to conduct the business of the corporation and that such salary and bonus contract was an obligation of the corporation and the fact that it may have decreased the dividends is beside the question. Remedies were ample and opportunities frequent to correct any violation of any law in which the trustee may have been engaged, whether as an officer of the corporation or as an officer of the Probate Court.

The United States Fidelity and Guaranty Company is a real party in interest, arising from the fact that it is a surety for Earl S. Davis in the sum of $300,000.00. The provision of the bond was for the faithful discharge of his duties as trustee. He died insolvent and the burden is now upon his bondsmen of paying any sum found due to the estate.

If it should be held that by signing a trust bond the bondsman becomes liable for the act of the principal, wholly disconnected with the trust estate, the writing of such bonds would be so hazardous as not to be engaged in or engaged in at prohibitive terms. The record of Davis as disclosed by his accounts in the Probate Court was open to the inspection of the bondsmen. Can it be that a bondsman is required in order to protect himself against the hazard not only to see that the princi-

pal properly accounts for the money coming into his hands but that it should follow him through every possible enterprise in which he is engaged to find out whether, while acting entirely within corporate authority he has done something against the interest of the estate.

I am, therefore, of the opinion that the salary and bonus drawn by Davis as an officer of the Peruna Company, and of the Railway Company, did not become a part of the trust estate or was not required to be accounted for by him as trustee except so far as he may have converted a portion of it to the so-called "secret" fund and thereby dedicated it to the trust estate, and that the assignment of errors Nos. 1 to 6 by the Fidelity and Guaranty Company should be sustained. Conceding, however, that I may have taken an erroneous view of this matter, we still have the question of acquiescence and laches of the beneficiaries treated on pages 80, et seq. of the brief of the Guaranty Company. It does seem to me from all the evidence that the beneficiaries who are now seeking to recover the salary paid to Davis by the Peruna Company through the instrumentality of the bonding company should be held to have acquiesced in this matter and to have no standing in their endeavor to receive compensation from the bonding company for those actions of Davis with which they were or might easily have been fully acquainted. They should have spoken when the knowledge came to their attention, and not have remained idle until Davis passed away leaving an insolvent estate. All during the years that Davis was trustee of the Hartman estate these beneficiaries had full opportunity to know and must be held to the knowledge of everything that is revealed by the inventories, records and accounts and also to the fact that Davis was drawing salary and bonus as an officer of the company. The court should not aid a party whose obligation is destitute of diligence and should refuse to interfere where there has been laches in prosecuting rights or where any acquiescence in the adverse rights has occurred.

Hammond v Hopkins, 142 U. S. 224; McCall v Casilear, 137 U. S. 556; **Bridenbaugh v King, 42 Oh St 410; Harris v Manufacturing Company, 84 Oh St 104.**

It is quite evident that should the majority opinion prevail the beneficiaries will receive more from the bonding company than they would have received had there been no increased salary or bonus drawn by Davis and Spetnagle. They will have profited by the decreased federal taxes because had the enlarged salaries or bonuses not been paid the government would have taken practically 60% of the corporate income. Under the present holding they will profit by the extent that their corporate tax was decreased by virtue of the reduced corporate income occasioned by the enhanced salaries and bonus, and have the whole of the salary of Davis paid into the trust estate by the bondsman.

There is much else that might be said in this matter, but this opinion is overly long for a dissenting opinion.

In all other matters, which are many and important, I agree with the majority.